UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION

UNITED STATES OF AMERICA

v.                                                              No. 5:25-cr-38-BJB

MAURICE LINEL WARD, JR.

\* \* \* \* \*

### OPINION & ORDER DENYING MOTION TO SUPPRESS

Maurice Ward stands charged in federal court with three firearm and drug offenses, *see* Superseding Indictment (DN 18), after Hopkinsville police officers found fentanyl and a gun in his truck. Ward moved to suppress that evidence, challenging various aspects of the investigation—which began with a confidential informant, led to the Oak Grove Casino, continued with a traffic stop nearby, and concluded with a dog sniff and a search of Ward's truck. *See* Motion to Suppress (DN 26) at 1–2 ("the search of his vehicle was warrantless, not consensual, and not made with reasonable suspicion or probable cause").

The Court held an evidentiary hearing on the motion. The Government offered testimony from the officers who searched Ward's car as well as documentary evidence regarding the traffic stop and the drug-sniffing dog's training record. Ward cross-examined the officers, challenged their story, and cast doubt on the hound. After the hearing, the Court ordered the parties to clarify their positions in supplemental briefing. *See* Memorandum of Conference & Order (DN 32).

Based on the evidence and briefing, and the facts established as a result, the Court denies the motion to suppress.

### FINDINGS OF FACT

In the winter of 2025, Maurice Ward, Jr., was a wanted man. Hopkinsville police "had active warrants for his arrest," Hearing Transcript (DN 33) at 6:23–24, related to "old traffic violations," *id.* at 12:18. Officers learned from a confidential informant that Ward could be found around the Oak Grove Casino, driving his father's black Nissan truck, and "likely carrying a firearm as well as fentanyl." *Id.* at 6:24–7:3, 7:16–18.

1

Hopkinsville Police Deputy Ryan Lassner staked out the casino in February. He found the Nissan truck in the parking lot, "hid," and "waited for" Ward to appear. *Id.* at 6:25–7:5. Eventually a man matching Ward's description headed out of the casino, hopped in the truck, and drove away. *See id.* at 7:5–7. Lassner followed in his cruiser until the truck rolled through a stop sign. *Id.* at 7:8–24. The Nissan also failed to "signal prior to 100 feet before reaching the stop sign." KYIBRS Report (DN 36-1) at 5. So Lassner "lit him up, stopped him, and … requested additional units just based upon the fact that he may be armed." Hearing Tr. at 8:4–5.

Inside the truck, Lassner found an "argumentative" Ward. With the help of backup, Lassner managed to pry Ward out of the truck and then restrain him. *Id.* at 8:6–9. *See also* KYIBRS Report at 5 ("I ordered Ward … to exit the vehicle and he was detained pending further investigation."). Once Ward was out, Lassner "conducted an ID and wants/warrants check with … dispatch, which revealed, in fact, he did have those two warrants for his arrest." Hearing Tr. at 9:1–3. So Lassner promptly arrested Ward "[a]nd then … requested additional units, including a K9 for a K9 sniff of the vehicle," thanks to the CI's report that Ward might have drugs and guns. *Id.* at 9:3–6. While waiting for the K9 unit, Lassner locked Ward in the back of his cruiser and "work[ed] on the citation," *id.* at 12:20–13:1, for "disregarding [the] stop sign" and "failure to or improper signal," KYIBRS Report at 1. *See also* Hearing Tr. at 15:2–11 (Ward was "already in the back of [Lassner's] vehicle," under arrest "[f]or his warrants," when Lassner summoned the dog).

Officer Cameron DeArmond eventually arrived with his dog, Nitro. DeArmond had served for about four years in the Hopkinsville and Oak Grove police forces. *Id.* at 18:14–22. But in February 2025, he'd only served as a K9 handler for "four to five months." *Id.* at 19:10. He and Nitro had been certified through an "outside agency" ("American Working Dog") after a three-week bootcamp. *Id.* at 19:12–20:25; *see* Narcotic & Patrol Detector Dog Certification (DN 36-3) at 2 (certifying "K-9 Nitro handled by Cameron Dearmond" on "October 30, 2024"). The program covered "narcotics training, … vehicle searches, building searches, article searches; searching for human scent and tracking; [and] patrol work, as in K9 deployments to fleeing suspects." Hearing Tr. at 20:7–10. DeArmond and Nitro learned to detect various drugs, as well as guns and other contraband, hidden in several locations—cars, buildings, and outdoors. *See generally* K9 Nitro Training Records (DN 36-3) at 3–33. And since earning their certification, the duo had searched suspected crime scenes "more than five times" and "continue[d] to train two Wednesdays a month with the whole agency." Hearing Tr. at 26:6, 21:8–9.

At Lassner's request, DeArmond and Nitro approached Ward's truck "to perform a free air sniff," as DeArmond credibly testified. *Id.* at 21:17–18. "As we went around the passenger side of the truck," according to DeArmond, "we passed the

passenger door.  When we arrived to the passenger tire well, my K9 performed an uncontrollable head snap back to the passenger door, turned around his whole body, went back to the passenger door, and began bracketing the door, attempting to get to the source odor."  *Id.* at 22:4–9.  In DeArmond's experience, that "is a significant change in behavior that [Nitro] only does when he is in narcotics odor"—and it's "considered a positive alert."  *Id.* at 22:12–16.  DeArmond's testimony tracked the report he filed after the seizure: "K9 Nitro was requested at a traffic stop by the CCSO.  K9 Nitro was deployed and showed a distinct change in behavior on the passenger side of the vehicle."  Hopkinsville Police K-9 Deployment Form (DN 36-3) at 1.

After Nitro alerted, police searched the car.  And their search confirmed the confidential informant's report:

> Inside of the vehicle a firearm (Springfield XD .40 SN#: GM136476) was located within the center console.  The firearm was loaded with S&W .40 caliber hollow-point rounds … The firearm appeared to be in good working order.  Also discovered within the center console was a Zip-loc style baggie containing two sand[w]ich baggies with a purple rock-like substance and a working scale.  Based upon [Lassner's] training and experience in the field of narcotics [he] immediately recognized the substance as fentanyl.  A MobileDetect drug testing kit was used which led to a presumptive positive reading for fentanyl.

KYIBRS Report at 5.  *See also* K-9 Deployment Form at 1 ("the CCSO located 44.4 Grams of Fentanyl and a gun inside the vehicle").

### REQUEST TO SUPPRESS THE FENTANYL AND GUN

Ward's motion, as clarified after the hearing, raised two questions: whether the police lawfully (1) stopped him and (2) searched his truck.  *See* Supplemental Brief (DN 35) at 1–2.

First, the post-hearing brief all but concedes that "there was a valid stop in the first place."  *Id.* at 1.  As Ward admits, an officer may lawfully stop a driver who commits a traffic infraction—even if the traffic stop is pretext for the real goal of executing an arrest warrant.  *Id.* (citing *Whren v. United States*, 517 U.S. 806 (1996)).

That's what the evidence shows here.  Lassner was investigating Ward, sought to arrest him under a warrant (which Ward hasn't challenged), found him at the casino, and tailed him until he identified a traffic violation.  Hearing Tr. at 6:14–9:4.  Ward's only real complaint is the thinness of the proof of the underlying violations that led to the stop: "The evidence that these violations occurred rests entirely on Deputy Lassner's testimony."  Supp. Br. at 1–2.  But that's hardly unusual with

traffic violations—as Ward seems to accept. *See id.* at 2 ("It is likely that, between these bases for the stop, the Court will find that it was valid."). And no contrary evidence supplies any reason to doubt the credibility of Lassner's story. So on this record, the stop was lawful.[1]

Second, and more vigorously, Ward presses his position that the police lacked probable cause to search his truck.[2] Supp. Br. at 2–7. But this argument also fails.

Under Fourth Amendment caselaw that Ward doesn't (and couldn't) resist, the alert of a competent drug dog furnishes probable cause to search a car. "If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search." *Florida v. Harris*, 568 U.S. 237, 246–47 (2013); *accord United States v. Saine*, 162 F.4th 804, 807 (6th Cir. 2025) ("a K9's positive alert presumptively supplies probable cause to search a vehicle so long as the government provides evidence that the K9 reliably identifies contraband in controlled settings").

That standard is plainly satisfied here. DeArmond and Nitro undisputedly received certification from an independent organization after they successfully completed a three-week intensive training program. Ward offers no reason to think that program inadequate. In fact, the record indicates that program covered many

---

[1] Before hearing evidence, the Court surmised that Ward intended to argue the lawful traffic stop was unreasonably delayed by Lassner's wait for the K9 team. *See* Hearing Tr. at 3:14–17 (discussing *Rodriguez v. United States*, 575 U.S. 348 (2015)). But then Lassner explained that he arrested Ward for his outstanding warrants before the wait began—and that before and during the dog sniff, Ward was under arrest in the back of his cruiser. *See* Hearing Tr. at 9:1–6 ("I conducted an ID and wants/warrants check with our dispatch, which revealed, in fact, he did have those two warrants for his arrest. At that time, of course, the clock[ ] stops and he's in custody. And then I requested additional units, including a K9[.]"). And DeArmond corroborated that account. *See id.* at 21:24–22:1 ("I got out of my car, realized that the driver of the vehicle was in the back of the sheriff's department's vehicle. I pulled my K9 out and conducted a free air sniff of the vehicle."); *accord id.* at 30:2–3. After these facts became clear, Ward rightly declined to press any argument under *Rodriguez*.

[2] Ward doesn't argue, and the record reveals no reason to think, that the dog sniff itself constituted a search. *See United States v. Fellmy*, 165 F.4th 501, 505–07 (6th Cir. 2026) ("Officers don't violate a driver's reasonable expectation of privacy when they walk a trained drug dog around a lawfully stopped car to sniff for drugs," and "performing [a] free-air sniff" involves at most "incidental contact with [a] car" that doesn't usually amount to physical trespass). *See also id.* at 522 (Hermandorfer, J., concurring) ("[N]either *Jones* nor *Jardines* confronted the legality of open-air dog sniffs in the chattels or traffic-stop context. So neither gave the Supreme Court any occasion to revisit its settled holding that such sniffs are not Fourth Amendment 'searches.'").

4

drugs in many settings. *See, e.g.*, Training Records at 3–4 (cocaine, heroin, and meth in "front grill," "under trunk," and "driver door"); *id.* at 13 (various drugs "[b]ehind … water heater," in "[k]itchen drawer"); *id.* at 15 (drugs "[u]nder rear of boat," "[i]nside bus stop booth").[3] The cop and his canine also practiced finding guns and ammo. *See, e.g.*, *id.* at 6 ("Camo bag with pistol rounds"); *id.* at 9 ("Loaded mag"); *id.* at 16 (unloaded magazine); *id.* at 31 ("Gun"). DeArmond and Nitro continued to train after receiving certification. *Id.* at 31–33; Hearing Tr. at 21:8–9. When, after this training, Nitro alerted next to Ward's truck, the officers had no reason to doubt that this supplied probable cause that they would find contraband inside, just as they did. *Id.* at 22:4–16; *Harris*, 568 U.S. at 246–47.[4]

Ward resists this straightforward conclusion in multiple ways, but none succeeds.

What if Nitro never alerted at all? "The United States has not," he points out, "presented evidence from Officer DeArmond's body camera documenting the sniff." Supp. Br. at 5. Another officer's "body camera captures part of the dog's route around the truck on the driver's side," *id.*; *see generally* DN 37, but no footage captured the alert on the passenger side—and no other officer testified to seeing it.[5] And no other officer followed DeArmond and Nitro around the car. So "the only thing that is memorialized as far as what the dog did or did not do"—aside from DeArmond's sworn testimony at the suppression hearing, of course—"would be what [DeArmond] reported to other officers." Hearing Tr. at 29:15–17.

Even though no contemporaneous corroboration exists, no evidence contradicts DeArmond's testimony, either. And DeArmond testified in detail to what happened at the scene. His testimony was credible and uncontroverted, and Ward's speculation that he could've perjured himself gives the Court no reason for doubt on that score. *See Carmell v. Texas*, 529 U.S. 513, 541–42 & n.30 (2000) (explaining that

---

[3] Unsurprisingly, the duo's training record was imperfect. Though some misses were apparently not Nitro's fault but DeArmond's—who sometimes failed to "rea[d] his dog's change[s] of behavior." Training Records at 20.

[4] Despite Nitro's training in both guns and drugs, and the presence of a gun in Ward's truck, DeArmond testified that Nitro's "significant change in behavior" "only" reflected the presence of "narcotics odor." Hearing Tr. at 22:12–13. *See also id.* at 27:13–21 (explaining that the "head snap," "direction change," and so on indicate "the odor of narcotics"). Neither side probed why DeArmond's testimony suggested an alert for drugs rather than guns. But any distinction seems immaterial on these facts.

[5] DeArmond explained that his camera was off because he "wasn't even supposed to be at work yet" when Lassner summoned him. Hearing Tr. 28:14–16. His "body cam wasn't logged in, and [he] didn't have access to Wi-Fi to get it logged in." *Id.*

corroboration is not a condition of witness credibility); *cf. United States v. White*, 990 F.3d 488, 492 (6th Cir. 2021) ("Probable cause does not demand resolving each jot and tittle of metaphysical doubt."). The only finding consistent with this record is that Nitro alerted.

What if Nitro and DeArmond were just too green? After all, they were only recently certified and claimed little field experience. Supp. Br. at 4–5.

But *Harris* expressly rejected a rule that would cast categorical doubt on alerts by certified but inexperienced "rookie dog[s]." 586 U.S. at 245. Police needn't "introduc[e] comprehensive documentation of the dog's prior 'hits' and 'misses' in the field," either—and "in most cases," "records of a dog's field performance … have relatively limited import" because field records typically undercount false negatives and overcount false positives. *Id.* It's Ward's prerogative, of course, to "contest the adequacy of [the] certification or training program," "examine how the dog (or handler) performed in the assessments made in those settings," and raise questions about the "circumstances surrounding a particular alert." 568 U.S. at 247. But under *Harris*, his focus on the date of Nitro's certification and his limited post-certification field experience does little (if anything) to undercut probable cause.[6] To the extent *Harris* identifies any categorical distinction, it's the dog's certification—not subsequent experience: Courts should presume reliability in dogs that have been certified, however recently, if a reliable, independent organization has vouched for those dogs' ability to detect contraband. "If the State has produced proof from controlled settings that a dog performs reliably in detecting drugs, and the defendant has not contested that showing, then the court should find probable cause." *See id.* at 248. Ward points to nothing in the American Working Dog program (or Nitro's performance in it) to impugn the trustworthiness of that credential.

But what if Nitro wasn't just inexperienced, but also incompetent? Although Ward never directly objects to the comprehensiveness of the training program or Nitro's performance in it, he does offer one thin reason to doubt "the government['s] evidence that the K9 reliably identifies contraband in controlled settings." *Saine*, 162 F.4th at 807. He points out that after certification but about six weeks before they checked Ward's truck, DeArmond and Nitro "'missed' four out of five 'hides' in a building detection" training exercise. Supp. Br. at 5 (citing Training Records at 33).

---

[6] Whether recency of training cuts for or against reliability is hardly clear. Big-game experience counts for something, but so does recent time spent in the gym (as any athlete can attest). The record here doesn't indicate if drug dogs are sharpest toward the beginning or end of their careers. So the Court has no reason to conclude that Nitro's relative juniority undercuts probable cause.

6

But that exercise, according to the training records, involved a very different setting: it was set in a "large," "difficult" Rural King building "with hide hidden deep." Records at 33. Nitro's errors, moreover, were false *negatives*—not false positives. Failing to detect contraband in one training session that involved a very different situation than Ward's car gives the Court little reason to doubt that Nitro's alert next to the passenger door would reliably signal the presence of contraband.

Perhaps, Ward wonders, these incomplete arguments can nevertheless recombine, like a mosaic, as a Fourth Amendment violation? *Cf. Al-Adahi v. Obama*, 613 F.3d 1102, 1105 (D.C. Cir. 2010) ("Those who do not take into account conditional probability are prone to making mistakes in judging evidence. They may think that if a particular fact does not itself prove the ultimate proposition …, the fact may be tossed aside and the next fact may be evaluated as if the first did not exist."). This search, Ward notes, was the product of "a team that has been certified for about four months, a team who had several 'misses' in a training session about 6 weeks before this sniff, and a behavior change that allegedly took place on the unrecorded side of a vehicle." Supp. Br. at 6. True, "much like every other probable-cause inquiry, whether a canine sniff can support probable cause rests on all the circumstances." *United States v. McCarley-Connin*, 148 F.4th 808, 819 (6th Cir. 2025). "The question … is whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Harris*, 568 U.S. at 248.

Although Ward asks some of the right questions, he fails to find the right answers. As explained above, the Government offered uncontested "evidence of [Nitro's] satisfactory performance in a certification or training program." *Id.* at 245–46. And none of Ward's arguments—alone or together—overcome the ensuing presumption of reliability. *See id.* at 248. Nothing more than Ward's speculation suggests that DeArmond lied and Nitro didn't in fact alert. Ward offered no evidence concerning "the adequacy of" the "training program," asked no questions to DeArmond about Nitro's performance "history in the field," and made no argument that "the officer cued the dog" or that "the team was working under unfamiliar conditions." *Id.* at 247. Recent certification is a mixed signal at best. *See* above n.6. And Ward gave the Court no reason to doubt the reliability of Nitro's alert in targeted vehicle sniffs (as opposed to other, more daunting hunts, *see* above at 7 (Rural King training)). Nothing plus nothing plus nothing is still nothing. *Cf. United States v. Jones*, 625 F.3d 766, 769 (D.C. Cir. 2010) (Sentelle, J., dissental) ("The sum of an infinite number of zero-value parts is still zero.").

Indeed, the extrinsic evidence supports rather than undercuts probable cause. Nitro's training records show he consistently detected hidden drugs in a wide array of circumstances—and seemingly recorded zero false positives. A confidential

informant had already told the officers that Ward was carrying drugs. Although Lassner "did not 'know the specifics'" of the confidential informant's report, Supp. Br. at 7 (quoting Hearing Tr. at 9:17–20), he knew of it from the Hopkinsville P.D.'s anti-crime unit, Hearing Tr. at 6:22, 9:21–23. That he executed the warrant without also personally managing the informant matters little; police officers acting in good faith are allowed to divide their labors and work as a team. "It is not necessary that the evidence establishing probable cause reflect the direct personal observations of a law enforcement official." *United States v. Miller*, 314 F.3d 265, 268 (6th Cir. 2002). The tip further corroborated the suspicion raised by Nitro that Ward's car contained drugs and other contraband.

The Court therefore finds that Nitro's alert, along with "all the facts surrounding [his] alert, viewed through the lens of common sense," *Harris*, 568 U.S. at 248, gave the police probable cause to search Ward's truck.

## ORDER

The Court denies Ward's motion to suppress (DN 26).

Benjamin Beaton, District Judge
United States District Court

August 5, 2026

8